IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES FIRE
INSURANCE COMPANY, et al.,

      Plaintiffs,

v.                                                        No. 05-2192- JWL-DJW

BUNGE NORTH AMERICA, INC., et al.,

      Defendants,

   and

THE FIDELITY AND CASUALTY
COMPANY OF NEW YORK, et al.,

      Additional Cross-Claim Defendants.

**MEMORANDUM AND ORDER**

Pending before the Court is a Sealed Motion for Relief Pursuant To Rule 26(b)(5)(B) (doc. 449) filed by Bunge North America, Inc. ("Bunge"). More specifically, Bunge requests

- an *in camera* review of a document that was inadvertently disclosed by The Fidelity and Casualty Company of New York ("F&C"), which F&C claims is protected from disclosure by the work product doctrine; and

- a determination that the document inadvertently disclosed by F&C is not protected from disclosure by the work product doctrine and thus does not need to be returned.

For the reasons stated below, Bunge's Motion will be granted.

**Procedural Background**

On August 29, 2006, and as part of its Rule 26(a)(1) initial disclosures, F&C produced to Bunge a document bearing bates stamp number 1000852. On August 6, 2007, almost a year later, Bunge served written discovery upon F&C requesting information about document number 1000852. On August 13, 2007, F&C served a letter on all counsel of record regarding document number

1000852 stating that "after investigation and consideration," F&C had determined this document qualifies as "work product prepared in anticipation of litigation" and thus is immune from discovery. F&C demanded that all parties return document number 1000852. Bunge does not believe the document at issue is protected work product and thus has filed this Motion to resolve the issue.

## Discussion

To establish work product protection, a party must show that "(1) the materials sought to be protected are documents or tangible things; (2) they were prepared in anticipation of litigation or for trial; and (3) they were prepared by or for a party or a representative of that party."[1] Because there is no dispute that the material is a document and was prepared by or for an F&C representative, the Court addresses only whether the document was prepared in anticipation of litigation.

The work product doctrine, which is embodied in Rule 26(b)(3) of the Federal Rules of Civil Procedure, protects from discovery documents, things and mental impressions of a party or his representative, particularly his attorney, developed for or in anticipation of litigation or trial.[2] The purpose of the doctrine is to permit attorneys to prepare for litigation with a "certain degree of privacy," and without undue interference or fear of intrusion or exploitation of one's work by an adversary.[3] In other words, the doctrine is not intended to protect investigative work unless done so under the supervision of an attorney in preparation for the real and imminent threat of litigation or trial. Work prepared in the ordinary course of business and inserted into a protected document may still be subject to disclosure after redaction of any privileged material.

---

[1] *Johnson v. Gmeinder*, 191 F.R.D. 638, 643 (D. Kan. 2000) (citations omitted).

[2] Fed. R. Civ. P. 26(b)(3).

[3] *Hickman v. Taylor,* 329 U.S. 495, 510-11 (1947).

Thus, the work product doctrine only applies to those documents and tangible things prepared in anticipation of litigation, and in order for the discovery limitation to apply, there must be a substantial probability that litigation will ensue at the time the documents were drafted.[4] "Certainly by implication the . . . rule precludes any idea of extending the work product doctrine to reports or statements, even if written, obtained by the client or his investigators which are not prepared under the supervision of an attorney in preparation for trial."[5]

The issue of whether documents were prepared in anticipation was extensively analyzed by Judge Rushfelt in *Marten v. Yellow Freight System, Inc.*[6]  The court stated:

> The work product standard has two components.  The first is what may be called the "causation" requirement.  This is the basic requirement of the Rule that the document in question be produced because of the anticipation of litigation, i.e., to prepare for litigation or for trial.  The second component is what may be termed a "reasonableness" limit on a party's anticipation of litigation.  Because litigation can, in a sense, be foreseen from the time of occurrence of almost any incident, courts have interpreted the Rule to require a higher level of anticipation in order to give a reasonable scope to the immunity.
>
> The court looks to the primary motivating purpose behind the creation of the document to determine whether it constitutes work product.  Materials assembled in the ordinary course of business or for other non-litigation purposes are not protected by the work product doctrine.  The inchoate possibility, or even the likely chance of litigation, does not give rise to work product.  To justify work product protection, the threat of litigation must be "real and imminent."  To determine the applicability of the work product doctrine, the court generally needs more than mere assertions by the party resisting discovery that documents or other tangible items were created in anticipation of litigation.[7]

---

[4]*Cypress Media, Inc. v. City of Overland Park*, 268 Kan. 407, 427, 997 P.2d 681 (2000); *Alseike v. Miller*, 196 Kan. 547, 558, 412 P.2d 1007 (1966).

[5]*Alseike*, 196 Kan. at 558.

[6]No. 96-2013-GTV, 1998 WL 13244, at *10 (D. Kan. Jan. 6, 1998).

[7]*Id.* (citations and quotations omitted).

As the asserting party, Defendant has the burden of establishing work product protection.[8] To carry that burden, Defendants must make a "clear showing" that the asserted objection applies.[9] A "blanket claim" as to the applicability of the work product doctrine does not satisfy the burden of proof.[10] It is well settled that the party seeking to invoke work product immunity has the burden to establish all elements of the immunity and that this burden can be met only by an evidentiary showing based on competent evidence.[11] That burden cannot be "discharged by mere conclusory or ipse dixit assertions."[12] A party's failure to meet this burden when the trial court is asked to rule upon the existence of the work product immunity is not excused because the document is later shown to be one that would have been privileged if a timely showing had been made.[13]

The document at issue is an interoffice memorandum drafted by former F&C employee Leticia Diaz on February 11, 1994. It is addressed to another former F&C employee, Gary Venezia. At the time the document was written, Mr. Venezia worked in F&C's toxic tort department as a claim analyst. Ms. Diaz also worked in the toxic tort department and was Mr. Venezia's supervisor. The memorandum discusses Ms. Diaz's review of Bunge's toxic tort claim file for information and documents regarding insurance coverage for the years 1961 to 1964. With regard to why she

---

[8] *See McCoo v. Denny's, Inc.*, 192 F.R.D. 675, 683 (D. Kan. 2000); *Boyer v. Board of County Comm'rs*, 162 F.R.D. 687, 688 (D. Kan 1995).

[9] *See McCoo,* 192 F.R.D. at 683; *Ali v. Douglas Cable Communications, Ltd. Partnership*, 890 F. Supp. 993, 944 (D. Kan.1995).

[10] *McCoo*, 192 F.R.D. at 680.

[11] *Id.*

[12] *Id.* (quotations and citations omitted).

[13] *Peat, Marwick, Mitchell & Co. v. West,* 748 F.2d 540, 542 (10th Cir.1984); *McCoo*, 192 F.R.D. at 680.

reviewed the file and drafted the memorandum, Ms. Diaz states "I just wanted to review the file and see exactly what has taken place throughout the years and what coverage decisions were made in the event this comes up in the future."

As stated above, the court looks to the primary motivating purpose behind the creation of the document to determine whether it constitutes work product. Here, Ms. Diaz explicitly states she reviewed the toxic tort claims file and wrote the memorandum in order to have a historical perspective in case the issue of insurance coverage for the years 1961 to 1964 comes up in the future. There is no evidence that the memorandum was prepared for an attorney or copied to an attorney and there is no mention in the memorandum of impending litigation or the likelihood of litigation. In fact, the memorandum was created eleven years before this litigation was filed.

Notwithstanding these facts, F&C insists the memorandum at issue was created in anticipation of litigation. First, F&C argues that its decision to decline coverage four days prior to creation of the document is conclusive evidence that the document was created in anticipation of litigation. Second, F&C argues that even if the Court determines the document was not prepared in anticipation of the environmental claims at issue in this litigation, there is sufficient evidence to demonstrate that the document was prepared in the course of the "dust claim" litigation between F&C and Bunge. The Court will address each of F&C's arguments below.

### Notification of Declination

F&C states the toxic tort department internal memorandum was written shortly after an F&C environmental claims adjuster wrote a letter to Bunge that

(1) disclaimed coverage for the environmental claim under a 1964 – 1967 policy;

(2) issued reservation of rights for the environmental claim under a 1967 – 1970 policy; and

(3) advised that the alleged 1961 – 1964 policy could not be located.

F&C asserts that its decision to decline coverage is the point at which the ordinary course of business ended and the anticipation of litigation began. Although the Court acknowledges that a declination of coverage could be the point at which the threat of litigation becomes real and imminent, such an assertion is not supported by the evidence presented in this case.

Many courts have observed that the application of the work product doctrine to documents prepared by insurance companies during claims investigations is difficult because the nature of the insurance business is such that an insurance company must investigate a claim prior to determining whether to pay its insured, and thus pre-litigation is the routine business of insurance companies.[14] F&C urges the Court to adopt a bright line rule that the ordinary course of business ends and anticipation of litigation begins as soon as the insurer decides to decline coverage. The court rejects this hard line approach and finds that the best way to determine whether a party's actions are in anticipation of litigation is "a case-by-case analysis, considering the unique factual context of the given problem."[15] Thus, the question of whether insurer and adjuster documents were created in anticipation of litigation depends on whether the party seeking protection can point to a definite shift made by the insurer or adjuster from acting in its ordinary course of business to acting in anticipation of litigation.[16] Here, the Court finds insufficient evidence to support a finding that the document was created in anticipation of litigation.

First of all, a declination as to the 1961-1964 policy had not occurred at the time document 1000852 (the subject matter of which is coverage from 1961-1964) was prepared. F&C merely

---

[14] *See, e.g., St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.*, 197 F.R.D. 620, 635 (N.D. Iowa 2000).

[15] *Id.* at 632.

[16] *Westhemeco Ltd. v. New Hampshire Ins. Co.*, 82 F.R.D. 702, 708-709 (S.D.N.Y. 1979)).

advised Bunge in the February 7, 1994 letter that it could not locate the alleged 1961-1964 policy. Moreover, the evidence submitted in conjunction with the pleadings demonstrates that in 1998 Bunge and F&C were still in discussions about 1961-1964 coverage and there was still no hint of litigation.[17]. Even by 2003, nearly a decade after 1000852 was prepared, there is still no indication of the possibility of litigation.[18] F&C states in 2003 that it was still "attempting to secure basic information about the claim, including the source of the purported releases, as well as the nature and scope of the alleged damage," that it was "attempting to confirm the existence of the 61-64 policy," and that "upon receipt of this information, we will be in a position to assess coverage."[19] Thus, in its own words, F&C's "plan of action" almost 10 years after creation of document 1000852 was information-gathering and coverage assessment, not litigation. Based on these facts, the Court finds F&C's contention that the memorandum was created in anticipation of litigation is without merit.

### Prepared in the Course of the Prior "Dust Claim" Litigation

Alternatively, F&C argues the document at issue should be afforded protection because it contains information about privileged settlement matters prepared in the then on-going grain dust litigations or "dust claims." F&C claims the document refers to F&C's defense strategy, its defense and indemnity arrangement, its coverage decisions, as well as other documents prepared in reaching the settlement of these grain dust claims. In support of this argument, F&C cites to the Tenth Circuit's decision in *Frontier Refining Inc. v. Gorman-Rupp Company, Inc.*[20] for the proposition that

---

[17] See 12/15/1998 letter from F&C to Bunge attached as Exhibit A to Bunge's Reply Brief (doc. 470) (within which F&C advises Bunge that F&C was "always willing to discuss coverage").

[18] See 11/18/2003 draft status report attached as Exhibit B to Bunge's Reply Brief (doc. 470).

[19] *Id.*

[20] 136 F.3d 695, 703 (10th Cir. 1998).

work product from prior litigation extends to current litigation. F&C's argument, and its reliance on *Frontier Refining*, are both misplaced.

First of all, there has been no evidence presented to demonstrate that the memorandum was created in conjunction with the dust claim litigation. Thus, there is no evidence that the memorandum is work product from prior litigation and reliance on *Frontier Refining* for this proposition is inapplicable to the circumstances presented in this case.

As noted, *supra*, the court is required to look to the primary motivating purpose behind the creation of the document to determine whether it constitutes work product, not whether the document happened to be created during the course of other litigation. Here, Ms. Diaz explicitly states in the memorandum itself that she reviewed the toxic tort claims file and wrote the memorandum in order to have a historical perspective in case the issue of insurance coverage for the years 1961 to 1964 comes up in the future. The following factual information from the declaration of Kathleen Coyle ("Coyle") submitted by F&C in conjunction with its briefing supports the conclusion that the memorandum was written in order to have a historical perspective in case the issue of insurance coverage for the years 1961 to 1964 came up in the future. A summary of the information within Coyle's declaration is as follows:

In 1994, Bunge submitted a pollution liability claim to F&C for the 1961-1964 time period, which F&C denied on grounds that the alleged 1961-1964 policy could not be located. Joan Blumenfeld ("Blumenfeld"), an F&C claims adjuster in the environmental department, drafted the communication to Bunge regarding the inability to locate the 1961-1964 policy. As a result of this communication, Bunge's insurance broker Ernie Schmidt ("Schmidt") met with Blumenfeld to point out that, in the context of prior litigation involving Bunge and F&C (referred to in this action as the "dust claims"), F&C had previously acknowledged the existence of, and liability under, an F&C

8

liability policy covering the years 1961-1964.

Blumenfeld subsequently advised the claims analyst supervisor within F&C's toxic tort department (the department who handled the "dust claims") of Schmidt's assertions. As a result, the claims analyst supervisor within the toxic tort department then drafted the memorandum at issue and sent it to a toxic tort claims analyst. According to Coyle's declaration, the memorandum "was written as a result of assertions concerning Bunge's alleged F&C insurance coverage that were made to Ms. Blumenfeld by Ernie Schmidt who was employed [as] Bunge's insurance broker, Johnson & Higgins." The declaration goes on to state that "the memorandum documents the issues raised by Schmidt and addresses how to handle those issues in light of what had previously transpired between Bunge and F&C in the context of the prior 'dust claims.'"

Coyle's declaration, and the statements in the memorandum itself stating that the author "just wanted to review the file and see exactly what has taken place throughout the years and what coverage decisions were made in the event this comes up in the future," refute F&C's assertion that the memorandum at issue was created for purposes of pursuing, or settling, the dust claim litigation. That the subject of the memorandum discusses liability coverage decisions for the dust claims is immaterial to the stated purpose for which the memorandum was created: to review coverage determinations in the past for purposes of handling liability coverage claims recently made by Bunge.

For all of the reasons set forth above, Bunge's Sealed Motion for Relief Pursuant To Rule 26(b)(5)(B) (doc. 449) is granted. Upon *in camera* review of document 1000852, the Court finds there is insufficient evidence to demonstrate that such document was created in anticipation of litigation. Therefore, the document is not protected from discovery by the work product doctrine and Bunge is not required to return the document to F&C.

IT IS SO ORDERED.

Dated in Kansas City, Kansas on this 20th day of December, 2007.

s/ David J. Waxse
David J. Waxse
United States Magistrate Judge

cc: All counsel and *pro se* parties