IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES FIRE INSURANCE COMPANY, et al., | ) )  ) |
| Plaintiffs, | ) ) |
| v. | ) |
| BUNGE NORTH AMERICA, INC., et al., | ) ) |
| Defendants, | ) ) |
| and | ) ) |
| THE FIDELITY AND CASUALTY COMPANY OF NEW YORK, et al., | ) ) ) |
| Additional Cross-Claim Defendants. | ) ) |
| _____ | ) |

Case No. 05-2192-JWL

## <u>MEMORANDUM AND ORDER</u>

In this case, Bunge North America, Inc. ("Bunge") claims liability insurance coverage relating to its environmental liability at three different sites in Kansas, under various policies issued by Travelers Casualty and Surety Company, f/k/a Aetna Casualty and Surety Company ("Travelers"). This matter presently comes before the Court on a number of motions, on which the Court rules as follows: Travelers's motion for summary judgment (Doc. # 666) is **granted in part and denied in part**. Bunge's motion to dismiss Travelers's cross-claim regarding its defense obligations (Doc. # 660) is **granted**. Bunge's motion for summary judgment on Travelers's affirmative defenses

(Doc. # 663) is **granted as unopposed in part and denied in part**.  Travelers's motion to sever claims and bifurcate the trial (Doc. # 692) is **granted in part and denied in part**.

<u>**Travelers's Motion for Summary Judgment**</u>

**I.    <u>Background</u>**[1]

Travelers's predecessor company issued eight successive primary general liability insurance policies to Bunge, each with a one-year policy period, collectively encompassing policy periods from September 29, 1970, to September 29, 1978. Subsequently, groundwater contamination was discovered at Bunge's grain elevator sites in Hutchinson, Kansas; Salina, Kansas; and Kansas City, Kansas (also called the Katy site).  Specifically, the groundwater was discovered to have been contaminated with carbon tetrachloride, a chemical that had been used in a grain fumigant (known as "80/20" in reference to the ratio of the constituent chemicals) at the three elevator sites. Bunge incurred remediation and settlement costs and obligations with respect to the contamination at the sites.  Bunge sought indemnification and defense costs relating to the contamination at all three sites under the policies issued by Travelers.  Bunge and Travelers subsequently executed various settlement agreements, by which they have resolved any issues relating to Travelers's duty to defend Bunge under the policies with

---

[1]Additional facts, viewed in the light most favorable to Bunge, the non-moving party, are related within the discussion of particular issues below.

respect to contamination at the three sites.

Two excess liability insurers instituted this action by bringing declaratory claims against Bunge (the insured) and other primary and excess insurers to determine the parties' various obligations relating to contamination at the Hutchinson site. Travelers asserted a cross-claim against Bunge for declaratory relief with respect to all three sites, and Bunge eventually asserted declaratory and damage claims against various insurers, including Travelers, relating to all three sites. The parties reached a number of settlements, and the only claims remaining in this action are Bunge's claims against Travelers and Bunge's claims against Continental Insurance Company ("Continental"), as well as Travelers's cross-claim against Bunge. The present Order concerns only the claims between Bunge and Travelers.[2]

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th

---

[2]Bunge and Continental have informed the Court that they have reached a settlement of the remaining claims involving them. Pursuant to those parties' request, the Court has not yet ruled on various pending motions filed by Bunge and Continental concerning those claims.

Cir. 2006).  An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).  A fact is "material" when "it is essential to the proper disposition of the claim."  *Id*.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro*, Inc., 428 F.3d 933, 935 (10th Cir. 2005).  To accomplish this, sufficient evidence pertinent to the material issue  "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and

4

inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.   <u>Existence of Coverage and Application of the Pollution Exclusion</u>

A.   *Policy Language and Applicable Standards*

Each policy issued by Travelers to Bunge covers an "occurrence," which is defined as "an accident, including injurious exposure to conditions, which results . . . in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The policies also require that the injury or property damage have taken place during the particular policy periods. Each policy also contains a "pollution exclusion," which provides that coverage does not extend "to bodily injury or property damage arising out of the discharge, dispersal, release or escape of . . . contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply . . . if such discharge, dispersal, release or escape is sudden and accidental." The policies also exclude coverage for damage to Burge's own property.

The insured bears the burden of establishing coverage under an insurance policy, and therefore it also bears the burden of showing that the property damage was unintended and unexpected under the Travelers policies' definition of "occurrence." *See Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, 774 N.E.2d 687, 690-92 (N.Y.

2002).[3]  The New York Court of Appeals adopted a "transaction as a whole" test for

applying this definition in *McGroarty v. Great American Ins. Co.*, 329 N.E.2d 172, 174-

75 (N.Y. 1975).  The court noted that "[n]o all-inclusive definition of 'accident' is

possible, nor any formulation of a test applicable in every case, for the word has been

employed in a number of senses and given varying meanings depending upon the

relevant context."  *Id.* at 176 (quoting *Croshier v. Levitt*, 157 N.E.2d 486, 487 (N.Y.

1959)).  The court discussed the proper analysis as follows:

> One often contemplates and envisions a sudden or catastrophic
> event when considering the term accident—an event which is
> unanticipated and the product of thoughtlessness rather than willfulness.
> But a broader view must be taken of the term for otherwise how could we
> classify catastrophic results which are the unintended fruits of willful
> conduct.  Certainly one may intend to run a red light, but not intend that
> the catastrophic result of collision with another car occur.  Calculated risks
> can result in accidents.  Judge Cardozo framed the situation perfectly . . .:
> "Injuries are accidental or the opposite, for the purpose of indemnity,
> according to the quality of the results rather than the quality of the
> causes." . . . [Judge Cardozo] added:  "The character of the liability is not
> to be determined by analyzing the constituent acts, which, in combination,
> make up the transaction, and viewing them distributively.  It is determined
> by the quality and purpose of the transaction as a whole."
>
> We agree that this "transaction as a whole" test should be applied
> by the fact finder when determining whether the term accident is
> applicable to a given situation.  We agree also that it is not legally

---

[3]The parties agree that, because the policies were made and issued in New York,
that state's substantive law applies to Bunge's coverage claims.  *See Klaxon Co. v.
Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (federal court in diversity case must
apply choice of law rules of forum state); *Simms v. Metropolitan Life Ins. Co.*, 9 Kan.
App. 2d 640, 642-46, 685 P.2d 321, 324-26 (1984) (under Kansas law, construction of
an insurance contract is governed by the law of the state in which the contract was
made).

> impossible to find accidental results flowing from intentional causes, i.e., that the resulting damage was unintended although the original act or acts leading to the damage were intentional.

*Id.* at 174-75 (quoting *Messersmith v. American Fidelity Co.*, 133 N.E. 432, 433 (N.Y. 1921)).  The New York Court of Appeals has also discussed this "occurrence" definition as follows:

> We have read such policy terms [requiring that the injury be unexpected and unintended] narrowly, barring recovery only when the insured intended the damages.  Resulting damage can be unintended even though the act leading to the damage was intentional.  A person may engage in behavior that involves a calculated risk without expecting that an accident will occur—in fact people often seek insurance for just such circumstances.

*Continental Casualty Co. v. Rapid-American Corp.*, 609 N.E.2d 506, 510 (N.Y. 1993) (citations omitted).

The Second Circuit Court of Appeals has reviewed and discussed New York law construing this definition of "occurrence":

> The New York courts have tended to read the "expect or intend" provision fairly narrowly.  It is apparent that to do otherwise, and to exclude all losses or damages which might in some way have been *expected* by the insured, could expand the field of exclusion until virtually no recovery could be had on insurance.  This is so since it is mishaps that are "expected"—taken in its broadest sense—that are insured against.
>
> The New York courts have generally read "expect or intend" provisions to exclude only those losses or damages that are not accidental.  The problem is one of defining "accidental."  Although there is no simple or all-encompassing definition of "accidental," it is possible to identify a few central principles in the New York courts' treatment of the term.
>
> In attempting to define what events are "accidental", the New York courts have focused on the nexus between an intentional act and the

resulting damage.  As this court has observed, the distinction is drawn between damages which flow directly and immediately from an intended act, thereby precluding coverage, and damages which accidentally arise out of a chain of unintended though expected or foreseeable events that occurred after an intentional act.  Ordinary negligence does not constitute an intention to cause damage; neither does a calculated risk amount to an expectation of damage.  Thus, though an *intentional* act may ultimately cause certain damages, those damages may, under New York law, be considered "accidental" if the total situation could be found to constitute an accident.

In general, what make injuries or damages expected or intended rather than accidental are the knowledge and intent of the insured.  It is not enough that an insured was warned that damages might ensue from its actions, or that, once warned, an insured decided to take a calculated risk and proceed as before.  Recovery will be barred only if the insured intended the damages or if it can be said that the damages were, in a broader sense, "intended" by the insured because the insured knew that the damages would flow directly and immediately from its intentional act.

*City of Johnstown, N.Y. v. Bankers Std. Ins. Co.*, 877 F.2d 1146, 1149-50 (2d Cir. 1989)

(citations and quotations omitted) (citing, *inter alia*, *McGroarty*, 329 N.E.2d at 175).[4]

---

[4]Travelers, citing *County of Broome v. Aetna Casualty and Surety Co.*, 540 N.Y.S.2d 620 (N.Y. App. Div. 1989), argues that this Court should apply an objective standard, under which property damage would not be unintended and unexpected if the insured knew or should have known that there was a substantial probability that property damage would result from its acts.  *See id.* at 622.  The Court agrees with the Second Circuit that such a standard, for which the *Broome* court relied almost exclusively on law from other states, conflicts with New York law, including the Court of Appeals's opinion in *McGroarty*.  *See City of Johnstown*, 877 F.2d at 1151 n.1; *see also Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1205 (2d Cir. 1995) (rejecting objective standard in favor of a subjective standard under New York law; "ordinary negligence does not constitute an intention to cause damage, and a calculated risk does not amount to an expectation of damage").  The particular policy language here, which refers to "property damage neither expected nor intended *from the standpoint of the insured*" (emphasis added), further supports the application of a subjective standard in this case under New York law.

As noted above, the policies' pollution exclusion does not apply to releases that are "sudden and accidental."  The New York Court of Appeals has held that such a provision unambiguously requires that the release be *both* sudden and accidental, which terms have separate meanings.  *See Northville Indus. Corp. v. National Union Fire Ins. Co.*, 679 N.E.2d 1044, 1046-48 (N.Y. 1997).  "[T]he term 'accidental' excludes any intentional discharge of a pollutant from qualifying for the exception."  *Id.* at 1047.  "Furthermore, the term 'accidental' includes not only an unintended event but also one occurring unexpectedly or by chance."  *Id.* at 1047 (quoting *Webster's 9th New Collegiate Dictionary*).  The term "sudden" includes a temporal element, which requires a discharge occurring abruptly or precipitantly, or one brought about in a short time.  *Id.* at 1048.  A process is not "sudden" if it "occurs slowly and incrementally over a relatively long time, no matter how unexpected or unintended the process."  *Id.* (quotation omitted).

> The focus in determining whether the temporally sudden *discharge* requirement is met, for the purpose of nullifying the pollution coverage exclusion, is on the initial release of the pollutant, not on the length of time the discharge remains undiscovered, nor the length of time that damage to the environment continued as a result of the discharge, nor on the timespan of the eventual dispersal of the discharged pollutant in the environment.

*Id.*  "[T]he temporal aspect of the sudden discharge element would only be met by the discharge, abruptly or within a short timespan, of a significant quantity of the pollutant sufficient to have some potentially damaging environmental effect."  *Id.*  Finally, once the insurer establishes the application of the pollution exclusion, the burden shifts to the

insured to demonstrate a sudden and accidental discharge in satisfaction of the exception. *See id.*

Accordingly, assuming application of the pollution exclusion, Bunge, in order to establish coverage, must show a sudden and accidental release of the contaminant that results in unexpected and unintended property damage during the policy periods, under the standards discussed above.

B.      *Application of Exclusion to Groundwater Contamination*

Bunge argues that Travelers has not met its burden of establishing application of the pollution exclusion to Bunge's release of contaminants into the groundwater because Travelers has not shown that the particular groundwater at issue here is bounded or is a major aquifer such that the groundwater could be considered a "watercourse" or "body of water" under the exclusion. *See State of N.Y. v. Travelers Indem. Co.*, 508 N.Y.S.2d 698, 701 (N.Y. App. Div. 1986). The Court rejects this argument. In *Travelers*, the exclusion did not also apply to releases "into or upon land [or] the atmosphere," as it does in this case. There is no dispute that in the occurrences alleged by Bunge, the contaminant entered the groundwater through the ground at Bunge's sites. Thus, the releases here were into or upon land, and the exclusion applies. *See Mesa Operating Co. v. California Union Ins. Co.*, 986 S.W.2d 749, 758 (Tex. Ct. App. 1999) (rejecting the same argument where the exclusion also applied to releases into land or the atmosphere and the contaminant had reached the groundwater through soil and rocks); *see also Northville*, 679 N.E.2d at 1046 (in applying the pollution exclusion to releases of

contaminant to groundwater, court quoted only the exclusion's application to releases "into or upon land" while substituting an ellipsis for the exclusion's "water" terms). The Court therefore rejects this argument in opposition to summary judgment.

### C.   *Timing of Contamination of Groundwater*

Travelers argues that it is entitled to summary judgment on all of Bunge's coverage claims because Bunge cannot produce evidence that the contaminants, whenever released into the soil, actually reached the groundwater—thereby causing third-party property damage—before or during the applicable policy periods.[5] The Court rejects this basis for summary judgment.

The Court does agree that Bunge must show that the contaminants actually reached the groundwater before or during the policy periods. The policies allow coverage for property damage to third parties occurring during the policy periods. Bunge suggests that it can meet this standard by showing release into the soil during or before the policy periods if eventual contamination of the groundwater was imminent. In the only case cited by the parties in which this very issue was addressed under New York law, the court held that actual contamination of the groundwater during the policy period was necessary to trigger coverage. *See Employers Insurance of Wausau v. Duplan Corp.*, 1999 WL 777976, at *25-29 (S.D.N.Y. Sept. 30, 1999).

---

[5]Travelers appears to concede that Bunge may assert coverage for releases into the groundwater occurring prior to the policy periods, based on the continued migration of the contaminants during the policy periods.

In *Duplan*, the court applied New York's "injury-in-fact" standard, under which coverage is triggered if an actual injury takes place during the policy period, regardless of when the cause of the injury happened or when the injury was discovered. *See id.* at *25-27.  The court further noted that New York cases have held that in the context of property damage caused by pollution, coverage is triggered at the time of the contamination.  *See id.* at *27.  The court then concluded as follows:

> To resolve [this issue], I begin with the Second Circuit's observation . . . that under the standard "occurrence" definition, injury cannot be read as the equivalent of exposure, because the policy contemplates injury caused by exposure; since a cause normally precedes its effect, it is plain that an injury could occur during the policy period although the exposure that caused it preceded that period.  As one New York court has observed, the policy does not include mere exposure to "conditions" existent during the policy period, but rather focuses on the "result" in "bodily injury" during the policy period.  In certain cases, the cause and damage may be temporally close, as in the case of installation of asbestos, or disposal or pollution directly onto land or water.  But the fact that coverage is predicated not on the act which might give rise to ultimate liability, but upon the result means that coverage is not triggered by the release of contaminants alone.  Since actual property damage must occur during the policy period as the authorities instruct, mere discharge cannot trigger coverage when the damage allegedly caused thereby did not commence until the pollutants reached, and contaminated, the subject property.  Unlike the [site] itself therefore, it is not possible to equate "damage" with "discharge" with respect to contamination of the Aquifer, since it indisputably would have taken some appreciable amount of time for any PCE released onto the . . . site to reach the underground water supply.

*Id.* at *28 (quotations and citations omitted).  The court then noted that the Fourth Circuit had reached the same conclusion on this very issue.  *See id.* at *28-29 (citing *Spartan Petroleum Co. v. Federated Mutual Ins.*, 162 F.3d 805, 807-11 (4th Cir. 1998)).  The

court continued:

> This reasoning is consistent with New York's injury-in-fact approach. It would be antithetical to a rule that requires "actual" damage to allow coverage to be triggered at some point before the property that is the subject of the claim is harmed. The injury-in-fact rule requires actual contamination of the property alleged to have been damaged, which in the case of the Aquifer dictates that coverage is not triggered until the PCE actually reached the groundwater that comprises it. In consonance with *Spartan*, I conclude that the date of contamination of the Aquifer controls, not some earlier date when PCE may have been released onto the . . . site.

*Id.* at *29.

Bunge cannot cite to any contrary caselaw. Instead, Bunge relies on cases allowing coverage for the costs of remediation undertaken before contamination actually reached the groundwater in an effort to prevent such further contamination. Those cases do not address the issue present in this case, however, in which the third-party property damage—groundwater contamination—has actually occurred. Under New York law, coverage predicated on injury that must occur during the policy period is not triggered by the occurrence of the causitive event during the policy period. *See National Casualty Ins. Co. v. City of Mount Vernon*, 515 N.Y.S.2d 267, 270 (N.Y. App. Div. 1987). In light of New York's "injury-in-fact" standard, the Court agrees with the reasoning of the courts in *Duplan* and *Spartan*, and it concludes that the New York Court of Appeals would do likewise if presented with the same question. Therefore, Bunge must prove that contamination of the groundwater actually occurred during or prior to the applicable policy periods.

Travelers argues generally that Bunge has not produced any evidence of the

specific timing of the contaminant's reaching the groundwater below Bunge's sites. The Court disagrees. Bunge's expert witness, J.D. Campbell, testified that the contaminant in this case was much heavier than water and tended to descend into the groundwater; that "in terms of the timing [of any release from the property into the groundwater], the timing would have been directly and near the time of those . . . significant releases;" that there are indications that the groundwater itself was impacted by the contaminant as early as 1965; that in one instance, the contaminant penetrated into the ground "relatively rapidly" and would have penetrated into the groundwater table "very shortly" after the release; and that contamination of the groundwater occurred in periods preceding 1956.[6] Moreover, Richard Hughto, an expert retained by the insurers in this case, testified that in different instances, the contaminant would reach the groundwater very quickly, possibly within minutes or hours, and probably within the same day. Finally, Bunge has produced evidence of spills going back as far as the 1950s. A jury could reasonably infer from this evidence that contaminant actually reached the groundwater at Bunge's sites prior to September 29, 1978, the end of the policy periods. Accordingly, summary judgment is not warranted on this basis.

        D.    *Waiver of "Expected or Intended" Defense*

Bunge argues that Travelers waived its defense that the property damage here was

---

[6]Although Travelers has moved to strike various opinions by Dr. Campbell, it has not challenged this specific opinion concerning the timing of the contaminant reaching the groundwater.

not unexpected and unintended by not including that defense in reservation-of-rights letters sent to Bunge.  The New York Court of Appeals has held that the waiver doctrine is inapplicable to an issue regarding the existence or non-existence of coverage because coverage under a policy cannot be extended without a supplemental contract.  *See Albert J. Schiff Assocs. v. Flack*, 417 N.E.2d 84, 87 (N.Y. 1980).  To establish coverage under the Travelers policies in the first instance, Bunge must prove property damage neither expected nor intended.  Such an issue of coverage is not subject to waiver, and the Court therefore rejects this argument in opposition to summary judgment.

### E.    *"Routine" Leaks and Spills*

Travelers argues that Bunge routinely allowed leaks of fumigant to occur from pumps, and that as part of Bunge's normal business operations, such leaks were expected or intended and therefore cannot constitute "occurrences" under the policies.  Travelers relies on evidence that the pumps were designed to leak or drip a certain amount for proper use; that Bunge observed leaks and continued to use the pumps; and that Bunge knew that the fumigant was a dangerous chemical, as shown by training involving its handling and warnings on the product.  Travelers thus argues that a substantial probability existed that Bunge's operations with the pumps would result in the resulting contamination and property damage.

The Court has no difficulty concluding that a question of fact remains for the jury with respect to such leaks under the "transaction as a whole" test and the other standards set forth above.  First, the Court has rejected the objective standard proposed by

Travelers.  In addition, Bunge has cited evidence that a constant leak or drip rate was not in fact required for the operation of the pumps; that, according to Travelers's own expert, the amount of fumigant leaked for proper operation of the pumps would most likely have evaporated and would not have caused this contamination; that witnesses at the site did not actually experience continuous leaks or drips with the pumps, a fact acknowledged by Travelers's expert; and that leaks from the pumps were infrequent, occurred only when seals failed, were unexpected and accidental, and were addressed by preventative maintenance and immediate repair.  Bunge also cited evidence that the danger to the environment from this fumigant was not known until the 1980s, after the expiration of the policy periods; thus, even if Bunge had intended routine leaks (despite the evidence to the contrary), Bunge has produced sufficient evidence that it nevertheless did not intend the resulting property damage.  Accordingly, Travelers is not entitled to summary judgment on any of Bunge's claims on this basis.

F.   *Hutchinson Site*

The Court now turns to each particular site at which contamination occurred. Travelers challenges whether Bunge can establish coverage with respect to two particular alleged spills at the Hutchinson site.

1.   300-GALLON SPILL

The entirety of Bunge's evidence with respect to one alleged occurrence at Hutchinson consists of one line in a handwritten summary by Bunge employee Don Harrington of a telephone call with Bunge employee Everett Wooledge: "Approx 300

16

Gal spill 15/20 years ago." Mr. Harrington testified that he did not recall this conversation or anything else related to such a spill. Mr. Wooledge testified that the only spill he could recall was a different spill occurring in the mid- or late-1970s. Travelers argues that this evidence, without further evidence about the duration and manner of the spill, is not sufficient to create a jury issue as to whether Bunge can satisfy its burden under the "sudden and accidental" exception to the pollution exclusion.

The Court concedes that evidence of this alleged spill is exceedingly thin. The Court agrees with Bunge, however, that the use of the word "spill" creates the necessary issue of fact. In its ordinary sense, the word "spill" can connote an event that is of short duration, as opposed to a lengthy discharge or release; and can connote a release that is not intended. The Court concludes that a reasonable jury could so find, and thus could infer from the choice of the word "spill" that the release was both sudden and accidental. Summary judgment on this basis with respect to this alleged spill is denied.[7]

## 2. FAILED PRESSURE TANK

Travelers also attacks a spill that allegedly occurred in the mid- or late-1970s, in which a pressure tank failed and fumigant ran down the side of very tall grain bins.

---

[7]Travelers asserts in its reply brief that the Harrington memo constitutes inadmissible hearsay. The Court will not consider such issues raised for the first time in a reply brief. *See, e.g.*, *Minshall v. McGraw Hill Broadcasting Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003) (argument raised for first time in reply brief deemed waived). Moreover, the statement concerning the spill is arguably admissible under various hearsay exceptions, including Fed. R. Evid. 803(6) (relating to business records), and thus the Court would not resolve this issue on summary judgment even if timely raised.

Travelers first argues that Bunge cannot show that the event occurred prior to the end of the policy periods on September 29, 1978.  The Court disagrees.  It is true that Mr. Wooledge testified that this event took place "[i]n the '70s, late 70s . . . [l]ike '76 to '78, '79," and such evidence might not be sufficient by itself.  Mr. Wooledge also stated in a sworn affidavit, however, prior to his deposition, that the event took place "[a]t some time in the mid-1970s."  In addition, in a 1995 letter to the KDHE, Bunge referred to the event as having occurred "some time in the mid 1970s."  This evidence is sufficient to create an issue of fact, as a jury could reasonably infer from such evidence that the event more likely than not took place prior to September 29, 1978.

Travelers also argues that Bunge cannot show that the fumigant actually reached the ground in this incident, as required for eventual contamination of the groundwater. Travelers cites the testimony of Donald Payne, an eyewitness to the spill, that no fumigant actually reached the ground.  Mr. Wooledge testified, however, that the fumigant did reach the ground and was absorbed into the soil.  Although Mr. Wooledge did not witness the actually spill, he arrived on the scene immediately thereafter, and he observed the wet soil where the fumigant entered the ground.  Such conflicting testimony presents a classic question of fact for the jury, and summary judgment is not appropriate on this basis.

G.    *Salina Site*

1.    OVERFILLING OF AST-1

Travelers also challenges three alleged releases at the Salina site.  The first such

release allegedly occurred while the AST-1 tank was being filled with fumigant. Travelers questions the sufficiency of the evidence that the spill was sudden and accidental and that it occurred before September 29, 1978 during the policy periods.

The only evidence of this spill comes from Bunge employee Dale Ackley, who testified that Billy Pape, another employee, told him about the spill, and that "it sounded like it had happened within the last year before [Mr. Ackley] started" in October 1979. This evidence constitutes hearsay. Bunge asserts that the statement from Mr. Pape, who is now deceased, could be admissible under Fed. R. Evid. 804(b)(3) as a statement against interest by an unavailable declarant, although Bunge has not explained how that exception would apply to this statement.

In any event, even if the statement could be admissible, Bunge cannot meet is burden to provide evidence that the spill occurred during the policy period. Mr. Ackley's testimony concerning the timing of the event could reasonably be interpreted to refer either to the calendar year 1978 or to the twelve months prior to his starting in October 1979. In either case, however, the jury would not have evidence that the event occurred, *more likely than not*, prior to September 29, 1978. Accordingly, Bunge cannot rely on this alleged occurrence in its claim for coverage.[8]

_____

[8]Because Bunge has asserted other bases for its claim for coverage with respect to contamination at the Salina site (e.g., Headhouse-A bootpit and various minor spills and leaks), the Court does not enter judgment in favor of Travelers with respect to this alleged occurrence. *See City of Wichita v. U.S. Gypsum Co.*, 828 F. Supp. 851, 869 (D. Kan. 1993) (Fed. R. Civ. P. 56 does not authorize summary judgment with respect to part (continued...)

### 2.     SPILL BY PRIOR OWNER AT HEADHOUSE-F

Travelers also challenges Bunge's allegation regarding a spill that occurred at Headhouse-F during the prior ownership of the Salina site.  Bunge's only evidence of this event comes from Bruce LaGroon, who testified that he had been told by some unknown person that on one occasion during the prior ownership, a pump had been left on and fumigant ran down the outside of Headhouse-F.  Such evidence clearly constitutes hearsay, and Bunge has not cited any exception under which the statement by the unknown declarant could be admitted.  Accordingly, Bunge cannot establish this alleged spill, and no triable issue concerning such a spill remains for trial.  *See* Fed. R. Civ. P. 56(d)(1).

### 3.     SPILL INTO HEADHOUSE-A BOOTPIT

Travelers next challenges the sufficiency of the evidence of an alleged spill into the bootpit of Headhouse-A at the Salina site.  Various witnesses testified that the spill, which resulted from a failure of seals during the night, was unexpected.  Therefore, whether the release was "sudden and accidental" presents a question of fact for trial.

Travelers also challenges whether the event occurred during the policy periods.  One witness, William Magdeburg, stated in his sworn affidavit that the event occurred between May 1975 and April 1977, based on the date he started work at the site and the

---

[8](...continued)
of a claim), *aff'd in part and rev'd in part on other grounds*, 72 F.3d 1491 (10th Cir. 1996).  The Court does rule, however, that no triable issue of fact remains in support of this alleged occurrence.  *See* Fed. R. Civ. P. 56(d)(1).

date his father, a superintendent at the site, retired.  Mr. LaGroon testified that three spills occurred into that bootpit between 1977 and the mid-1980s, that they occurred closer in time to 1977 within that range, and that the first such event occurred prior to the elder Mr. Magdeburg's retirement.  Travelers points to a number of inconsistencies in the various witnesses' accounts in arguing that there must have been only a single spill at the bootpit, which took place in the 1980s.  Mr. Lagroon specifically testified to multiple spills, however, and there is sufficient evidence from which a jury could find a release occurring during the policy periods.  This basis for summary judgment is denied.

> H.    *Kansas City (Katy) Site*

Travelers seeks summary judgment on Bunge's claim for coverage with respect to the Kansas City, Kansas (Katy) site, on the basis of the pollution exclusion.  Travelers points to the admission by Bunge's expert, J.D. Campbell, that a release at that site resulting from a corroded pipe was not sudden or abrupt.  Bunge does not dispute that admission.  Thus, Bunge cannot assert such an occurrence at trial.  *See* Fed. R. Civ. P. 56(d)(1).  As Bunge points out, however, it has also alleged various other spills and leaks occurring at that site, and Travelers, in arguing that leaks were necessary for proper operation of the pumps, has conceded that minor leaks did occur.  Therefore, summary judgment is not appropriate on Bunge's entire claim for coverage with respect to the Katy site.

### IV.    Late Notice of Claim Regarding Salina Site

Travelers seeks summary judgment on Bunge's claim for coverage with respect to the Salina site on the basis that Bunge did not comply with the notice-of-claim provision of the policies.  Travelers argues that neither of Bunge's possible notice letters, dated April 22, 1996, and June 23, 1995, was timely following Bunge's notification to KDHE on May 26, 1995, of possible contamination at the site.

The policies contain the following notice-of-claim provision:

> If claim is made or suit is brought against the insured, the insured shall immediately forward to [the insurer] every demand, notice, summons or other process received by him or his representative.

Thus, under the clear language of the policies, Bunge was not required to give notice to Travelers of *potential* claims; rather, Bunge was obligated to forward demands that it actually received.

Travelers has not identified any other source for a notice-of-potential-claim requirement (separate from the notice-of-occurrence requirement, discussed below).  Nor has Travelers offered any evidence that Bunge failed to provide timely notice of a demand or claim that it actually received.  Accordingly, summary judgment is not warranted on this basis.

### V.    Late Notice of Occurrence

Travelers argues that Bunge failed to give timely notice of three particular alleged occurrences:  the 300-gallon spill at the Hutchinson site, the mid-1970s pressure tank

failure at the Hutchinson site, and the spill into the bootpit of Headhouse-A at the Salina site. Travelers notes that Bunge did not give notice of these particular occurrences until during the present litigation, a fact that Bunge has not disputed.

A.   *Governing Standards*

The policies contain the following notice-of-occurrence provision:

> In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and available witnesses, shall be given by or for the insured to [the insurer] or any of its authorized agents as soon as practicable.

The New York Court of Appeals has set forth the law governing the late notice defense as follows:

> Notice provisions in insurance policies afford the insurer an opportunity to protect itself, and the giving of the required notice is a condition to the insured's liability. Absent a valid excuse, a failure to satisfy the notice requirement vitiates the policy, and the insurer need not show prejudice before it can assert the defense of noncompliance.
>
> There may be circumstances, such as lack of knowledge that an accident has occurred, that will explain or excuse delay in giving notice and show it to be reasonable. But the insured has the burden of proof thereon. Moreover, he must exercise reasonable care and diligence to keep himself informed of accidents out of which claims for damages may arise.
>
> Then, too, a good-faith belief of nonliability may excuse or explain a seeming failure to give timely notice. But the insured's belief must be reasonable under all of the circumstances, and it may be relevant on the issue of reasonableness, whether and to what extent, the insured has inquired into the circumstances of the accident or occurrence.
>
> Finally, a provision that notice be given "as soon as practicable"

23

> after an accident or occurrence, merely requires that notice be given within
> a reasonable time under all of the circumstances.

*Security Mutual Ins. Co. v. Acker-Fitzsimons Corp.*, 293 N.E.2d 76, 78-79 (N.Y. 1972)

(citations omitted).

The Second Circuit has noted that New York courts have held on a number of

occasions that unexcused delays of approximately one month or less rendered notice

untimely and discharged the insurer's obligation to provide coverage.  *See American*

*Home Assur. Co. v. Republic Ins. Co.*, 984 F.2d 76, 78 (2d Cir. 1993) (concluding that

notice of an accident after a 36-day delay was untimely, and citing other New York cases

in which similar delays were deemed untimely).

## B.    *Actual Knowledge Trigger*

In response, Bunge first argues that Travelers has not shown that Bunge's

obligation to provide notice with respect to the three alleged occurrences was actually

triggered under additional notice provisions in the policies.  For example, the first four

policies at issue here (for policy years 1970-71, 1971-72, 1972-73, and 1973-74) provide

in a notice-of-occurrence endorsement as follows:

> Notice of an occurrence for which any insured under this policy may be
> held liable shall be given by the insurance department of Bunge
> Corporation.

The latter four policies (for the policy years 1974-75 through 1977-78) contain the

following provision:

> It is agreed that written notice given to [the insurer] or any of its
> authorized agents as soon as practicable after the occurrence becomes

24

known to Edward Schroeder-Assistant Secretary shall be sufficient
compliance with the notice of occurrence condition of the policy.

Bunge argues that until Bunge's insurance department (in the case of the first four

policies) or Mr. Schroeder (in the case of the latter four) obtained actual knowledge of

an occurrence, no notice obligation arose, and that Travelers has not provided evidence

concerning any such knowledge sufficient to trigger the notice obligation.

The Court concludes that the policies unambiguously contain no requirement of

knowledge by the insurance department or by Mr. Schroeder before Bunge's obligation

to provide notice of an occurrence is triggered.  In the case of the first four policies, the

provision at issue simply states that notice shall be given by the insurance department.

If anything, it imposes an obligation on Bunge; under no reasonable interpretation of the

provision has Bunge's notice obligation been relaxed in any manner.  Accordingly, the

Court rejects this possible excuse for a failure of notice with respect to claims under the

first four policies.

Similarly, the latter four policies do not provide that Mr. Schroeder must have

actual knowledge of an occurrence before Bunge's notice obligation is triggered.  Rather,

they unambiguously provide that notice given after Mr. Schroeder has obtained such

knowledge shall be sufficient compliance with the notice requirement.  Thus, the policies

provide one possible way for Bunge to meet its notice obligation, but they do not

otherwise limit the operation of the notice requirement.  Bunge has not shown that it did

in fact provide notice of these occurrences within a reasonable after Mr. Schroeder

actually gained knowledge of them (one way to satisfy its notice obligation). Accordingly, the policy provision that includes the reference to Mr. Schroeder does not excuse Bunge's performance under the notice-of-occurrence provision in the latter four policies.

### C.   *Occurrences at Hutchinson and Salina Sites*

Bunge also argues that any delay in providing notice of these three occurrences should be excused because the fumigant was not considered to present a risk to the environment and the contamination of the groundwater was unknown at the time of those spills.  Bunge also generally argues that the reasonableness of its delay presents a question of fact for the jury.

Bunge has indeed provided evidence that the risk from this contaminant was not generally know prior to the mid-1980s.  Bunge has not provided evidence, however, that the risks remained unknown for another two decades after that, up until the time of this litigation, in which Bunge first gave notice of these three alleged occurrences. Moreover, the undisputed evidence shows that Kansas and federal regulatory agencies were investigating groundwater contamination at the Bunge sites as early as 1985 (Hutchinson) and the early 1990s (Salina).  Bunge has offered no other excuse for its delay in providing notice of these three occurrences (an issue on which Bunge bears the burden of proof).  Accordingly, the Court concludes as a matter of law that Bunge did not provide timely notice with respect to these three occurrences.  *See* Fed. R. Civ. P.

56(d)(1).[9]

> D.   *Waiver of Defense*

Finally, Bunge argues that Travelers has waived its untimely-notice-of-occurrence defense.  With respect to Hutchinson occurrences, Bunge argues that Travelers waived its defense by failing to include it in its September 6, 1985, reservation-of-rights letter.  With respect to Salina occurrences, Bunge argues that Travelers waived the defense by failing to assert it within a reasonable time.

With respect to Bunge's first waiver argument,

> [i]t is a well settled principle of New York law that once an insurer specifies the particular grounds upon which it disclaims coverage, the insurer waives its right to subsequently disclaim based on other unspecified grounds, provided the insurer possessed sufficient knowledge of the circumstances regarding the unasserted ground.

*Olin Corp. v. Ins. Co. of N. Am.*, 2006 WL 509779, at *2 (S.D.N.Y. Mar. 2, 2006) (citing *State v. AMRO Realty Corp.*, 936 F.2d 1420, 1432 (2d Cir. 1991) and *General Accident Ins. Group v. Cirucci*, 387 N.E.2d 223 (N.Y. 1979)).  New York courts have applied the same rule concerning disclaimers to reservation-of-rights letters.  *See, e.g.*, *id.* at *3 (no basis for distinction between the two types of letters).

In *TIG Insurance Co. v. Town of Cheektowaga*, 142 F. Supp. 2d 343 (W.D.N.Y.

---

[9]In arguing in favor of summary judgment on the basis of untimely notice of occurrences, Travelers did not specifically address the smaller, unspecified leaks and spills alleged to have occurred at the three sites.  Accordingly, the Court's rulings in this Order with respect to late notice do not apply to Bunge's claims for coverage based on those smaller events.

2000), an insurer had informed its insured that it was "reserving all of its rights with respect to this claim, including the right to disclaim coverage entirely in the event that this claim is ultimately determined to be outside the scope of the alleged policy." *See id.* at 365.  The court ruled that although the insurer had reserved its right to disclaim in the event the claims were outside the scope of coverage, it had not reserved its right to disclaim based on late notice; therefore, because the insurer had had sufficient information to alert it to the possibility of a late notice defense, the court held that the defense had been waived. *See id.* at 366-67.  The court also held that a separate insurer who had reserved all of its rights without specifying any particular potential disclaimer ground had not waived its late-notice defense. *See id.* at 370.

In its September 6, 1985, letter to Bunge, Travelers acknowledged receipt of the claim regarding the Hutchinson site that Bunge had forwarded; listed the liability policies issued to Bunge; and quoted the general provision relating to coverage, the policies' definitions of "occurrence" and "property damage," and the policies' pollution and owned-property exclusions.  The letter then stated:

> At this time, though, we do agree to investigate and participate in the defense of this suit under a full reservation of rights and disclaimer of coverage, *as previously enumerated in this letter*.

(Emphasis added.)  The letter did not refer to the policies' notice provisions or a possible late notice defense.

Travelers argues that it did not waive its late-notice defense because it reserved all rights in this letter.  The letter did refer to (and quote at length) specific policy

28

provisions whose application could preclude coverage, however, and the highlighted language in the excerpt above could reasonably be interpreted on its face to limit Travelers's reservation of rights to the particular issues arising from the provision quoted in the letter. Neither party has offered any evidence concerning the proper interpretation of this language. Accordingly, a question of fact remains concerning whether Travelers failed to reserve all rights and thus waived its late-notice-of-occurrence defense.[10] As a further result, the Court cannot finally rule as a matter of law with respect to the application of Travelers's late-notice-of-occurrence defense to the two alleged occurrences at the Hutchinson site.

Bunge argues that Travelers waived the late-notice-of-occurrence defense as it relates to the Salina site by failing to assert it within a reasonable time. The cases cited by Bunge in support of such an obligation, however, involved statutory requirements for timely disclaimers. *See, e.g.*, *Tully Constr. Co. v. TIG Ins. Co.*, 43 A.D.3d 1150, 1152 (N.Y. App. Div. 2007). Bunge has not shown that any such statute applies in the present case. Accordingly, the Court rejects Bunge's waiver argument as it relates to the Salina site. Because Bunge failed to provide timely notice of the alleged occurrence involving

---

[10]Travelers also argues that because Bunge had not provided notice of any particular occurrences under the policies, it did not have information regarding the potential for a late-notice-of-occurrence defense sufficient to have waived the defense. It would seem that, because Travelers had received no such notices from Bunge and because an occurrence is required for coverage under the policies, Travelers would have known of the possibility of the defense. The Court need not decide at this time whether the issue may be decided as a matter law, however, in light of the Court's ruling that a question of fact remains concerning the interpretation of the reservation-of-rights letter.

the bootpit at Headhouse-A at the Salina site, Bunge may not rely on that event for coverage.  *See* Fed. R. Civ. P. 56(d)(1).

## VI.   **Other Claims**

Bunge seeks damages other than for indemnification under the policies, including consequential damages, punitive damages, and attorney fees.  Bunge seeks such extra-contractual damages based on its claim that Travelers acted in bad faith with respect to its claims under the policies, in breach of the implied covenant of good faith and fair dealing.  Travelers seeks summary judgment on all such damage claims.

### A.    *Choice of Law*

The Court must first decide the applicable choice-of-law question.  Travelers argues that, like the coverage claims, Bunge's lack-of-good-faith claims are governed by the law of New York, where the polices were made and issued.  Bunge argues that Travelers's obligations under the policies regarding payment and investigation of the insurance claims were to be performed in Kansas and that Kansas law should therefore govern these claims.

As noted above, this Court must apply Kansas's choice of law rules in deciding which state's substantive law to apply.  *See Klaxon Co.*, 313 U.S. at 496.  Kansas courts follow the Restatement (First) of Conflict of Laws (1934).  *See Layne Christenson Co. v. Zurich Canada*, 30 Kan. App. 2d 128, 141, 38 P.3d 757, 766 (2002).  The First Restatement contains two general principles for contracts cases.  First, section 332 of the Restatement provides the primary rule that the law of the place of contracting governs the validity and effect of promises with respect to various issues, including, "except as stated in § 358, the nature and extent of the duty for the performance of which a party

31

becomes bound." Restatement (First) § 332; *see Layne Christenson*, 30 App. 2d at 142, 38 P.3d at 766. Second, under Restatement section 358, "the law of the place of performance determines the manner and method of performance." *Layne Christenson*, 30 App. 2d at 142, 38 P.3d at 766 (citing *Aselco, Inc. v. Hartford Ins. Group*, 28 Kan. App. 2d 839, 21 P.3d 1011 (2001)); *see* Restatement (First) § 358. In *Layne Christenson*, the Kansas Court of Appeals noted that Kansas courts had struggled in choosing between the two rules, and it further noted that the Restatement itself, in its commentary, "acknowledges that the line between the two principles is not a bright one." 30 Kan. App. 2d at 142, 38 P.3d at 766 (citing Restatement (First) § 358 cmt. b). The comment to which the court referred states as follows:

> While the law of the place of performance is applicable to determine the manner and sufficiency and conditions under which performance is to be made, it is not applicable to the point where the substantial obligation of the parties is materially altered. As stated in § 332, Comment c, there is no logical line which separates questions of the obligation of the contract, which is determined by the law of the place of contracting, from questions of performance, determined by the law of the place of performance. There is, however, a practical line which is drawn in every case by the particular circumstances thereof. When the application of the law of the place of contracting would extend to the minute details of the manner, method, time and sufficiency of performance so that it would be an unreasonable regulation of acts in the place of performance, the law of the place of contracting will cease to control and the law of the place of performance will be applied. On the other hand, when the application of the law of the place of performance would extend to a regulation of the substance of the obligation to which the parties purported to bind themselves so that it would unreasonably determine the effect of an agreement made in the place of contracting, the law of the place of performance will give way to the law of the place of contracting.

Restatement (First) § 358, cmt. b, *quoted in part in Layne Christenson*, 30 Kan. App. 2d

at 142, 38 P.3d at 766-67.  The Court must attempt to draw such a line in this case.

The Court concludes that, if presented with the question, the Kansas Supreme Court would rule that the law of New York, as the place of contracting, would govern the issue of Travelers's liability for extra-contractual damages here.  The central question is whether and to what extent Travelers opened itself up to liability for breaches of good faith by entering into the insurance contracts with Bunge.  The Court is not concerned at this point with minor details about how Travelers performed any good faith obligation (for instance, with respect to investigation).  Thus, the issue more involves the substance of the obligations to which Travelers bound itself, and the law of the place of contracting is more appropriately applied under Restatement § 358 and its commentary.  *See also Aiken v. Employer Health Servs.*, 1996 WL 134933, at *4 (10th Cir. Mar. 23, 1996) (whether a contract contains an implied covenant of good faith is a question of contract construction, requiring application of the law of the place of contracting under Kansas's choice of law rules; only after the existence of such a covenant is found may the law of the place of performance be applied).  Accordingly, the Court applies the substantive law of New York.[11]

_____

[11]The Court's ruling also avoids the problem of identifying the place in which Travelers was in fact obligated to perform its duty of good faith with respect to payment and investigation.   Although Bunge insists that such duty was to be performed in Kansas, where the sites are located, there is little doubt that any investigation would have taken place in multiple places, including at Travelers's home in New York.  Moreover, Travelers would likely have made any indemnification payment from New York to Bunge's headquarters in Missouri (where it has made defense cost payments), and not

(continued...)

B.    *Claim for Breach of Good Faith*

Under New York law, "damages arising from a breach of a contract will ordinarily be limited to the contract damages necessary to redress the private wrong." *New York Univ. v. Continental Ins. Co.*, 662 N.E.2d 763, 767 (N.Y. 1995). Tort liability must be supported by a showing of tortious conduct separate and apart from the failure to fulfill contract obligations; "where a party is merely seeking to enforce its bargain, a tort claim will not lie." *Id.* at 767-68.

Despite the "bad faith" claims asserted in the Pretrial Order, Bunge now states that it has not brought a tort claim, but instead alleges a claim for breach of Travelers's contractual duty of good faith and fair dealing. In *New York University*, the New York Court of Appeals held that an insured's claim based in part on the insurer's failure to pay a claim and to investigate adequately did not state a tort claim in the absence of a separate underlying tort duty. *See id.* at 769-70. The Court then dismissed the insured's claim for breach of the duty of good faith as duplicative of the insured's basic claim for breach of the policy. *See id.* at 770.

Similarly, in this case, Bunge has not alleged any independent tort supporting its bad faith claim. Accordingly, the Court dismisses Bunge's separate claim for breach of

---

[11](...continued)
to Kansas. In the Court's view, this difficulty further weighs in favor of applying the law of the place of contracting in this case.

the duty of good faith as duplicative under New York law.[12]

Bunge insists that it may pursue a claim for consequential damages under New York law based on Travelers's breach of good faith.  Indeed, only this year, in *Bi-Economy Market, Inc. v. Harleysville Insurance Company of New York*, 10 N.Y.3d 187, 886 N.E.2d 127 (N.Y. 2008), the New York Court of Appeals permitted an insured to pursue a claim for consequential damages, including the demise of its business, based on the insurer's breach of its implied contractual duty of good faith and fair dealing in light of evidence that such a claim was reasonably foreseeable and within the contemplation of the parties at the time of contracting.  *See* 10 N.Y.3d at 196; *see also Panasia Estates, Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 203, 886 N.E.2d 135 (N.Y. 2008) (companion case to *Bi-Economy*).  In its summary judgment briefing, Travelers did not argue that a claim for consequential damages was not reasonably foreseeable or within the contemplation of the parties when the policies were issued.  Accordingly, Travelers has not shown at this stage as a matter of law that Bunge may not pursue a

---

[12]Bunge's claim for breach of good faith would also be subject to dismissal if Kansas substantive law were applied.  Kansas does not recognize a tort of bad faith, and an aggrieved insured's recovery is limited to policy benefits, costs, interest, and attorney fees where appropriate.  *See Spencer v. Aetna Life & Casualty Ins. Co.*, 227 Kan. 914, 926, 611 P.2d 149, 158 (1980).  A plaintiff may not maintain a separate claim for breach of the implied contractual duty of good faith under Kansas law, but instead litigates the breach in the main cause of action for breach of contract; and the plaintiff must point to a separate contract term that the defendant allegedly violated by failing to act in good faith.  *See Terra Venture, Inc. v. JDN Real Estate Overland Park, L.P.*, 443 F.3d 1240, 1244 (10th Cir. 2006).  Bunge has not identified a separate policy term that Travelers allegedly breached in failing to act in good faith.

claim for consequential damages based on the allegation (litigated within the context of its primary breach-of-contract claim) that Travelers breached its implied duty of good faith and fair dealing.[13]

C.     *Punitive Damages*

The New York Court of Appeals has made clear that an insured may not maintain a claim for punitive damages based on a claim for breach of good faith in the absence of an underlying breach of a tort duty separate from the contractual obligation.  *See New York Univ.*, 662 N.E.2d at 767, 769-70; *see also Bi-Economy*, 10 N.Y.3d at 193-94 (distinguishing consequential damages from punitive damages in allowing consequential damage claim for breach of duty of good faith).  Bunge has not provided evidence of or even alleged a breach by Travelers of a tort duty separate from its obligations under the policies.  Accordingly, Bunge may not maintain its punitive damages claim, and Travelers is entitled to summary judgment on that claim.

D.     *Attorney Fees*

Bunge argues that Kansas law should govern its claim for attorney fees, and it

---

[13]In its response brief, Bunge pointed to various acts by which Travelers allegedly breached its duty of good faith.  Bunge's allegations concerning Travelers's failure to pay its coverage claims and its failure to investigate adequately provide proper bases for the claim recognized in *Bi-Economy* as well as Bunge's claim for attorney fees.  Travelers's alleged conduct in breaching separate agreements with Bunge concerning defense costs are properly litigated only in a separate action for breach of those agreements, and Bunge's breach-of-good-faith claim in this case may not rest on such allegations.  Similarly, Bunge's allegations concerning Travelers's litigation tactics in this case do not provide a proper basis for a claim that Travelers breach its duty of good faith in performing its obligations under the policies.  *See* Fed. R. Civ. P. 56(d)(1).

36

asserts such a claim under Kan. Stat. Ann. § 40-256.  The Court concludes, however, based on the same choice of law analysis conducted above under Restatement (First) § 358, that the Kansas Supreme Court would likely apply New York substantive law to Bunge's claim for attorney fees.[14]

As a general rule under New York law, "an insured cannot recover his legal expenses in a controversy with a carrier over coverage, even though the carrier loses the controversy and is held responsible for the risk." *Sukup v. State*, 227 N.E.2d 842, 844 (N.Y. 1967).  The insured would not be permitted to recover such fees "in the absence of some extraordinary showing." *Id.*  The Court of Appeals articulated the following standard:

> It would require more than an arguable difference of opinion between carrier and insured over coverage to impose an extra-contractual liability for legal expenses in a controversy of this kind.  It would require a showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert it.

*Id.*; *see also Liberty Surplus Ins. v. Segal Co.*, 420 F.3d 65, 70 (2d Cir. 2005) (applying *Sukup* standard to insured's claim for fees based on bad faith).

Travelers argues that Bunge cannot meet this high standard for fees as a matter of law.  Because it asserted the application of Kansas substantive law, Bunge did not address satisfaction of the New York standard in its summary judgment brief.  Bunge's

---

[14]The parties appear to agree that the attorney fee claim presents an issue of substantive law, requiring application of Kansas's choice of law rules.  Bunge has not provided any authority to support the application of the Kansas fee statute to the denial of coverage under an insurance policy made and issued in another state.

attorney fee claim would ordinarily be considered by the Court as necessary and appropriate after trial on the claim for breach of contract.  Accordingly, the Court declines to consider this claim at this time, and Travelers's motion for summary judgment on the claim is denied.

### Bunge's Motion to Dismiss Cross-Claim
### Regarding Defense Obligations

Travelers has asserted a claim against Bunge seeking a declaratory judgment with respect to its duty to defend Bunge under the insurance policies.  Bunge seeks dismissal of that claim.

The parties agree that by entering into separate agreements, they have settled all issues between them concerning Travelers's duty to assume costs incurred by Bunge in defending the underlying claims by environmental regulatory agencies and third parties. Bunge argues that the issue of Travelers's duty to defend under the policies therefore cannot be redressed in litigation against Bunge, thereby robbing Travelers of standing to pursue the declaratory judgment claim in this action.  *See Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (redressability is a requirement for Article III standing).

Travelers responds that its claim is proper because it may still pursue a claim against other insurers to apportion any liability or defense costs relating to the

contamination at the three sites among all insurers whose policies may provide coverage. Travelers argues that a resolution of the issue of whether it had a duty to defend under the policies (regardless of its having undertaken that duty in the settlement agreements) will be useful in such litigation with other insurers, and that its injury in paying too large of a share of Bunge's costs and damages can therefore be redressed in this action by means of its declaratory judgment claim.

The Court agrees with Bunge that Travelers may not pursue its declaratory judgment claim in this action, and it therefore grants Bunge's motion to dismiss. Travelers concedes that any duty to defend under the policies has been subsumed in the settlement agreements with Bunge. The Court need not decide whether Travelers may nonetheless pursue a claim for contribution or allocation against other insurers in a separate action (no such claim has been preserved in the Pretrial Order for litigation in this action). Even if Travelers has suffered an injury in paying too large of a share, that injury cannot be redressed in this action, as this Court cannot order non-parties to make any payments to Travelers in this action.

Moreover, in light of the settlement agreements, Bunge no longer has any stake in the outcome of the question whether Travelers had a duty to defend under the policies. Accordingly, Bunge is not the proper defendant for such a declaratory claim by Travelers. *See, e.g.*, *Capitol Life Ins. Co. v. Gallagher*, 1995 WL 66602, at *6-7 (10th Cir. Feb. 7, 1995) (because the requested declaration would not be binding against non-parties, there could be no resolution of the party's rights and obligations relative to those

non-parties).  Any such claim is more properly brought in litigation with the insurers that have a stake in the resolution of the issue.

Moreover, even if Travelers could maintain its declaratory claim in this suit, the Court would exercise its discretion to decline to entertain the claim, for these same reasons.  *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 288-89 (1995) (district courts have discretion whether to entertain declaratory judgment actions).  Accordingly, Travelers's claim is dismissed for that reason as well.[15]

---

[15]Travelers notes that Bunge has asserted a similar declaratory claim against it regarding defense costs.  For the same reasons articulated here, that claim too is subject to dismissal.  The Court exercises its discretion to decline to entertain Bunge's declaratory judgment claim relating to Travelers's obligation to pay defense costs, and that claim is hereby dismissed.

### Bunge's Motion for Summary Judgment
### on Travelers's "Affirmative Defenses"

Bunge moves for summary judgment on most of the factual and legal defenses asserted by Travelers as "affirmative defenses" in its answer.[16]  With respect to nearly all of these defenses, Bunge argues that Travelers lacks a sufficient factual basis for a particular defense based solely on Travelers's corporate representative's failure to provide such a basis in his deposition.  Travelers accurately notes that the great majority of these defenses relate to matters on which Bunge actually bears the burden of proof in its effort to establish coverage under the policies issued by Travelers.

Fed. R. Civ. P. 56 allows for entry of summary judgment with respect to a single claim in a multiple claim action; however, the rule does not provide for partial summary judgment to dispose of only one aspect of a claim.  *See City of Wichita*, 828 F. Supp. at 869 (citing, *inter alia*, 10A C. Wright, et al., *Federal Practice and Procedure* § 2737, at 457 (2d ed. 1983)).  Accordingly, this Court will generally entertain a motion for summary judgment only with respect to a discrete claim or a true affirmative defense.  Bunge is not entitled to a judgment on any factual or legal defense asserted by Travelers with respect to an issue on which Bunge bears the burden of proof.  The Court therefore declines to consider Bunge's arguments at this time with respect to any defense asserted

---

[16]Specifically, Bunge seeks summary judgment on defenses 1 through 6, 9 through 12, 14 through 24, 26 through 30, 32, and 34, based on the order in which Travelers's "affirmative defenses" were listed in its answer.

by Travelers that does not represent a true affirmative defense on which Travelers bears the burden of proof, and Bunge's motion is denied to that extent.[17]

The Court agrees with Travelers that it bears the burden of proof on four of the defenses challenged by Bunge. Travelers has agreed to withdraw two of those defenses (defense 2, based on the statute of limitations; and defense 3, based on the doctrines of laches, unclean hands, waiver, and estoppel). Accordingly, Bunge's motion for summary judgment on those two affirmative defenses is granted as unopposed.

In defense 21, Travelers asserts as an affirmative defense that Bunge failed to mitigate its damages with respect to environmental contamination at the sites. Travelers has cited to evidence that Bunge failed to clean up various leaks and spills alleged to have occurred at the sites. Bunge argues that the policies imposed a duty to mitigate only after property damage was first discovered; the cited policy provision clearly does not impose such a discovery requirement, however. The Court concludes that a question of fact remains concerning whether Bunge adequately mitigated its damages by cleaning up and acting to prevent contamination at the sites. Accordingly, the Court denies summary judgment on this defense.

_____

[17]In addition, the Pretrial Order entered in this case supersedes the parties' pleadings. Therefore, technically, the defenses challenged by Bunge are no longer relevant. Any defense not asserted by Travelers in the Pretrial Order will be deemed waived, although Bunge has not challenged any of Travelers's defenses on that basis in this motion.

Finally, in defense 24, Travelers asserts that Bunge misrepresented or failed to disclose material facts to Travelers. Travelers supports the viability of this defense with evidence that Bunge failed to disclose releases of contaminant of which it had knowledge prior to the issuance of the insurance policies. Bunge responds that under the case cited by Travelers with respect to this defense, *Chicago Ins. Co. v. Kreitzer & Vogelman*, 265 F. Supp. 2d 335 (S.D.N.Y. 2003), Travelers must show that Bunge made an affirmative misrepresentation in response to a direct question about releases at the sites prior to the issuance of the policies. In fact, in the cited case, the court notes that "[t]he failure to disclose is as much a misrepresentation as a false affirmative statement." *Id.* at 343. Accordingly, the Court concludes that a question of fact remains with respect to this affirmative defense, and Bunge's motion for summary judgment on the defense is denied.

### Travelers's Motion to Sever Claims and Bifurcate Trial

Travelers moves, pursuant to Fed. R. Civ. P. 42(b), to sever all other remaining claims from the trial of Bunge's coverage claims. The parties have not disputed that Bunge's claim for attorney fees presents a question for the Court. *See, e.g.*, *Farr Man Coffee Inc. v. Chester*, 1993 WL 248799, at *44 (S.D.N.Y. May 28, 1993) (attorney fees are discretionary with the district judge upon a finding of bad faith under the *Sukup* standard), *aff'd*, 19 F.3d 9 (2d Cir. 1994). The Court thus agrees with Travelers that the

parties need not litigate that claim during the trial of the coverage claims to the jury.  In the event that Bunge prevails at trial, the Court will conduct separate proceedings on Bunge's attorney fee claim as necessary and appropriate.

The only other remaining claim outside of Bunge's claims for indemnification under the policies is Bunge's claim for consequential damages as a remedy for Travelers's alleged breach of the implied duty of good faith.  As explained above, under New York law, that claim is part of Bunge's main claim for breach of the policies.  Therefore, the Court concludes in its discretion that the considerations of judicial economy and potential prejudice do not weigh in favor of bifurcation in this case, and it declines to sever the issue of Bunge's entitlement to a certain type of damages from the remainder of Bunge's contract claim.

Accordingly, Travelers's motion to sever is granted with respect to the attorney fee claim, but denied in all other respects.

IT IS THEREFORE ORDERED BY THE COURT THAT Travelers's Motion for Summary Judgment (Doc. # 666) is **granted in part and denied in part**.  Summary judgment is granted in favor of Travelers on Bunge's claim for punitive damages and on its separate claim for breach of good faith.  The motion is denied with respect to Bunge's other claims.

IT IS FURTHER ORDERED BY THE COURT THAT Bunge's motion to dismiss Travelers's cross-claim for a declaratory judgment concerning its defense obligations (Doc. # 660) is **granted**, and Travelers's claim is hereby dismissed.  Bunge's claim for a declaratory judgment concerning Travelers's defense obligations is also dismissed.

IT IS FURTHER ORDERED THAT Bunge's motion for summary judgment on various defenses asserted by Travelers (Doc. # 663) is **granted in part and denied in part**.  Summary judgment is granted in favor of Bunge as unopposed on Travelers's affirmative defenses based on the statute of limitations, laches, unclean hands, waiver, and estoppel.  The motion is denied in all other respects.

IT IS FURTHER ORDERED THAT Travelers's motion to sever claims and bifurcate the trial (Doc. # 692) is **granted in part and denied in part**.  Bunge's claim

for attorney fees shall be submitted for resolution by the Court after trial.  The motion

is denied in all other respects.


         IT IS SO ORDERED.


         Dated this 4th  day of August, 2008, in Kansas City, Kansas.


                                             s/ John W. Lungstrum
                                             John W. Lungstrum
                                             United States District Judge